UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

| | |
|---|---|
| **JULIE K. BULLOCK**, | Case No. 2:14-cv-00873-KI |
| Plaintiff, | OPINION AND ORDER |
| v. | |
| **COMMISSIONER OF SOCIAL SECURITY**, | |
| Defendant. | |

    Merrill Schneider
    Schneider Kerr & Gibney Law Offices
    P.O. Box 14490
    Portland, OR 97293

        Attorney for Plaintiff


    S. Amanda Marshall
    United States Attorney
    District of Oregon

Page 1 - OPINION AND ORDER

Ronald K. Silver
Assistant United States Attorney
1000 SW Third Ave., Suite 600
Portland, OR 97201-2902

John C. Lamont
Special Assistant United States Attorney
Office of the General Counsel
Social Security Administration
701 Fifth Ave., Suite 2900 M/S 221A
Seattle, WA 98104-7075

  Attorneys for Defendant

KING, Judge:

Plaintiff Julie Bullock brings this action pursuant to section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner denying plaintiff's application for disability insurance benefits ("DIB"). I affirm the decision of the Commissioner.

## BACKGROUND

Bullock filed an application for DIB on February 9, 2010, alleging disability beginning September 1, 2008. The application was denied initially and upon reconsideration. After a timely request for a hearing, Bullock, represented by counsel, appeared and testified before an Administrative Law Judge ("ALJ") on August 27, 2012.

On October 25, 2012, the ALJ issued a decision finding Bullock not disabled within the meaning of the Act and therefore not entitled to benefits. This decision became the final decision of the Commissioner when the Appeals Council declined to review it on March 27, 2014.

**DISABILITY ANALYSIS**

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability. The evaluation is carried out by the ALJ. The claimant has the burden of proof on the first four steps. Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007); 20 C.F.R. §§ 404.1520 and 416.920. First, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(b) and 416.920(b). If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one

"which significantly limits [the claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. §§ 404.1520(c) and 416.920(c). If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the ALJ proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant performed in the past. If the claimant is able to perform work she performed in the past, a finding of "not disabled" is made and disability benefits are denied. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

If the claimant is unable to perform work performed in the past, the ALJ proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. Parra, 481 F.3d at 746. The claimant is entitled to disability benefits only if he is not able to perform other work. 20 C.F.R. §§ 404.1520(g) and 416.920(g).

## STANDARD OF REVIEW

The court must affirm a denial of benefits if the denial is supported by substantial evidence and is based on correct legal standards. Molina v. Astrue, 674 F.3d 1104, 1110 (9th Cir. 2012). Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion" and is more than a "mere scintilla" of the evidence but less than a preponderance. Id. (internal quotation omitted). The court must uphold the ALJ's findings if they "are supported by inferences reasonably drawn from the record[,]" even if the evidence is susceptible to multiple rational interpretations. Id.

## THE ALJ'S DECISION

The ALJ found Bullock's severe impairments to be: major depressive disorder, generalized anxiety disorder, and histrionic traits. These impairments, either singly or in combination, did not meet or medically equal the requirements of any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1. The ALJ concluded Bullock can perform a full range of work with the following nonexertional limitations: she should be limited to simple, routine and repetitive tasks of up to two steps; she can occasionally engage in simple decisionmaking; she can tolerate occasional, simple changes in the work setting; she should not be required to perform at a fast, production-rate pace; and she can tolerate occasional, superficial interaction with the general public and co-workers. Based on this residual functional capacity ("RFC"), Bullock cannot perform her past work but can perform other work in the national economy such as housekeeping/cleaner, auto detailer, and hand packager.

## FACTS

Born in 1964, Bullock was 44 years old at the time of her alleged onset of disability. She had completed two years of college, and had worked part-time as a classroom aide, in a bed and breakfast cleaning and taking reservations, in a health food store, and as a marketer and activity director at an assisted living facility.

At the time of the hearing she was working about four and a half hours a week cleaning two small offices. Her 15-year old son and 21-year old daughter were living with her, as well as a significant other, on a three-acre property. She kept horses, a cow, dogs, cats, and chickens, which the children helped her care for. She often asked her children to help her clean one of the offices if she was not up to it. She shopped for the household.

She alleges onset of her disability in September of 2008, although she cannot point to any reason in particular for choosing that date. She testified she found she was forgetting simple things at that time, like picking her son up from school or feeding the animals. Now, she testified, she cannot balance her checkbook, forgets to turn off her headlights, and cannot keep track of her keys. She is also a hoarder and cannot organize her home. She takes a nap almost every day.

She sought treatment for her depression in July of 2008, returning to the Peterson Clinic after a four-year lapse in therapy. At that time, she was working part-time and taking care of her mother who had dementia. She described headaches, spine discomfort, and feeling tired and "ground down." Tr. 261. She attended appointments every two weeks at the Peterson Clinic, receiving naturopathic treatment for her depression until December 2009.[1]

She also sought treatment for her depression and insomnia from Grant County Health, whose providers prescribed Zoloft, and then fluoxetine (also known as Prozac), in the fall of 2008. By January 2009, she reported treating her depression entirely with naturopathic medicines but was on amitriptyline for her insomnia. Her nurse practitioner recommended Prozac, but Bullock wanted to wait and see how the naturopathic medicines worked. At her

---

[1] Treatment notes are illegible.

Page 6 - OPINION AND ORDER

April 2009 visit, she reported trying 30 different naturopathic medicines for depression without result; she agreed to try trazodone and either fill a prescription for Prozac or Zoloft. When she returned a month later, she reported 50% reduction in her symptoms, but her job was terminated due to lack of funding; she was considering seeking disability for PTSD.

The next month, after describing Bullock's problems maintaining her household, her nurse practitioner opined that "it is very likely that she will be permanently, emotionally unable to maintain active employment; in fact can barely attend to the daily needs of herself and her family." Tr. 308. Three months later, Bullock reported having nightmares and her nurse practitioner advised increasing her Zoloft prescription if neural feedback did not help. By January 2010, Bullock was working part-time and caring for her ill mother; she was not going to counseling, not taking her vitamins, and had not increased her dose of Zoloft. Her nurse practitioner encouraged her to increase her dose of Zoloft.

At her March 2010 appointment, Bullock's nurse practitioner encouraged her to get outside and exercise. Bullock discussed a medication change at her May appointment. In September 2010, she reported having stopped taking her medications; she also described back pain as a result of extra yard work, feeding horses, and managing bales of hay. Her nurse practitioner encouraged her to break up with her live-in boyfriend who was causing her extra work without bringing any financial support to the household. At an April 2011 appointment, Bullock's nurse practitioner described Bullock as healthy though exhausted. He reported Bullock's belief that her symptoms were caused by fibromyalgia and he encouraged prescription assistance to try Cymbalta.

In May 2010, at the request of Disability Determination Services, Kenneth C. Dudley, Ph.D., undertook a comprehensive psychodiagnostic exam of Bullock. His extensive 12-page report assessed Bullock with the following impairments: major depressive disorder, mild severity; anxiety disorder NOS; histrionic personality traits; and a Global Assessment of Functioning score of 53-57.[2] Dr. Dudley concluded Bullock could perform work requiring simple instructions, although she would have moderate to severe problems interacting socially; telephone and computer based work would not pose a problem.

Beginning in February 2010 until August 2012, Bullock attended individual and group therapy sessions at Community Counseling Solutions led by various clinicians, including Carol Humphreys beginning in early 2011. Bullock sought out this counseling because the therapist she had been seeing the previous year was moving. Bullock initially complained of depression, anxiety, PTSD and insomnia, which had become worse since her divorce in 2003. She also reported fibromyalgia. At that point her GAF score was 64.[3] Tr. 645 (2/25/10). Over the course of her treatment with Community Counseling Solutions, Bullock's GAF scores ranged from 48 to 64 (Tr. 433, 643), but the vast majority of her scores fell in the 54 to 63 range. Tr. 597-643 (remained 63 or 64 through much of 2010 and into 2011, although fell to 60 on 8/12/10);

---

[2]The GAF is a scale from 1-100, in ten point increments, that is used by clinicians to determine the individual's overall functioning. A GAF of 51-60 means "**Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflicts with peers or co-workers)." The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV").

[3]A GAF of 61-70 means "**Some mild symptoms** (e.g., depressed mood and mild insomnia) **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships**." DSM-IV 34.

Tr. 378-522, 584-95 (fell to 58 beginning 3/8/11, and remained between 58 and 63 on the whole; lowest score of 48 on 4/7/11; more scores of 49-54 in May and again in late June 2011); Tr. 567-83 (GAF of 55-57 in Jan. 2012); Tr. 523-44 (GAF of 51-55 in Feb. 2012); Tr. 678-715 (GAF of 54-63 in Mar.-May 2012); Tr. 646-59; 665-77 (GAF of 50-56 in June-Aug. 2012).[4]

Kara Pattinson, Ph.D., a doctor with Community Counseling Solutions, examined Bullock over the course of two sessions, in June and July 2012, to counsel her about medications.

Humphreys completed a functional assessment on August 2012. She assessed Bullock with PTSD, panic disorder without agoraphobia, and major depressive disorder, recurrent and severe, without psychotic features. She felt Bullock's most limiting symptom was her memory, saying, "She 'appears' very capable, but has quite severe short and long term memory issues." Tr. 721. She believed Bullock could only work one to two hours a week.

## DISCUSSION

I.   Bullock's Credibility

The ALJ noted Bullock's activity level was inconsistent with her alleged limitations. As additional reasons to question her testimony, he also identified non-compliance with her medication regime, the possibility of secondary gain, and the fact that her complaints were not supported by the objective medical record. Bullock complains the ALJ never specifically stated why he found her testimony about memory and concentration problems not credible.

When deciding whether to accept the subjective symptom testimony of a claimant, the ALJ must perform a two-stage analysis. In the first stage, the claimant must produce objective

---

[4]A GAF of 41 to 50 means "**Serious symptoms** (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g. no friends, unable to keep a job)." Id.

medical evidence of one or more impairments which could reasonably be expected to produce some degree of symptom. Lingenfelter v. Astrue, 504 F.3d 1028, 1036 (9th Cir. 2007). The claimant is not required to show that the impairment could reasonably be expected to cause the severity of the symptom, but only to show that it could reasonably have caused some degree of the symptom. In the second stage of the analysis, the ALJ must assess the credibility of the claimant's testimony regarding the severity of the symptoms. Id. The ALJ "must specifically identify the testimony she or he finds not to be credible and must explain what evidence undermines the testimony." Holohan v. Massanari, 246 F.3d 1195, 1208 (9th Cir. 2001). General findings are insufficient to support an adverse credibility determination and the ALJ must rely on substantial evidence. Id. "[U]nless an ALJ makes a finding of malingering based on affirmative evidence thereof, he or she may only find an applicant not credible by making specific findings as to credibility and stating clear and convincing reasons for each." Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006).[5]

Contrary to Bullock's argument, the ALJ directly addressed Bullock's concentration and memory problems in a way that was sufficient to allow for meaningful review. After detailing Bullock's testimony, the ALJ stated, "In terms of the claimant's alleged mental impairments and their corresponding symptoms, the objective medical evidence does not fully support the level of limitation claimed." Tr. 27. As the ALJ noted, Dr. Dudley's testing (e.g. serial sevens and fives, percentage, simple division, verbal similarities problems, proverb interpretation, etc.) reflected

---

[5] The Commissioner preserves for appeal her disagreement with the clear and convincing standard, rather than the more deferential regulatory requirement for factual findings supported by substantial evidence. Def.'s Br. 9-10. The Ninth Circuit has rejected her argument. See Burrell v. Colvin, 755 F.3d 1133 (9th Cir. 2014) (reasserting that the ALJ must provide "specific, clear and convincing reasons" to support a credibility analysis).

Bullock's "high average intellectual capacity, reasoning abilities that were above average, attention and concentration in the average to high average range, processing speed within normal limits, and no deficits in receptive or expressive communication." Tr. 28. The ALJ also referred to Dr. Dudley's comment that the length of the interview (more than twice as long as usual) was due to Bullock's "noteworthy ability to specifically recall events and details, contrary to her reported deficits of long and short-term memory." Tr. 28.

The ALJ's explanation was not the kind of conclusory analysis deemed insufficient in Treichler v. Commissioner of Social Security Administration, 775 F.3d 1090, 1102-03 (9th Cir. 2014), where the court held it was error for the ALJ to include a single sentence that the claimant's statements were not credible to the extent they were inconsistent with the RFC.

Bullock takes issue with the ALJ's failure to account for Dr. Pattinson's description of a medication management session with Bullock in which Bullock's desire to give lots of detail interfered with completion of the interview. Bullock reads this comment as evidence of her own concentration and focus problems. However, the ALJ's decision reflected Dr. Pattinson's opinion that Bullock "had a generally linear thought process, and her cognition appeared grossly intact despite her complaints about severe memory deficits." Tr. 29. Further, Dr. Dudley similarly noted Bullock's highly detailed answers but nevertheless assessed Bullock's concentration as being in the average to high average level. His finding was based on his review of the medical records and an in-person examination. Tr. 28. The ALJ's interpretation of the evidence regarding Bullock's ability to concentrate is supported by substantial evidence. Treichler, 75 F.3d at 1098 (reviewing courts "leave it to the ALJ to determine credibility, resolve conflicts in the testimony, and resolve ambiguities in the record").

Page 11 - OPINION AND ORDER

While the medical record alone is an insufficient reason to question a claimant's credibility, the ALJ's reliance on other reasons–which Bullock does not question–are additional support for his conclusion. See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001) (medical evidence is relevant factor, but cannot reject testimony solely on basis of medical evidence). Specifically, her statement that she could only walk 100 feet is belied by her contemporaneous activities, such as hunting, bowling, doing yard work, feeding horses, and managing bales of hay. Compare Tr. 196 (April 2010 function report) with Tr. 247 (November 2009 hunting), Tr. 351 (September 2010 yard work), Tr. 481 (October 2011 hunting), Tr. 468 (November 2011 hunting), Tr. 67 (hearing testimony that she hurt her back while bowling). Less than candid statements are a relevant credibility consideration. Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008). Bullock's daily activities also suggest she is capable of more than she reported. She prepares meals daily, goes in the yard a few times a day, goes into town every two to three days, shops, takes her son to sporting events, and attends church once or twice a month.

In addition, the ALJ found suspicious Bullock's failure to treat her depression with medication, or increase her dosage as prescribed. Id. ("unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment" is credibility factor); Tr. 27 (not taking naturopathic vitamins prescribed to her for depression; did not increase her anti-depressant dosage as instructed); Tr. 29 ("reported that was no longer taking her anti-depressant;" two years later "reported that she stopped using Cymbalta because she was afraid of becoming dependent"). It is true one of these times her nurse practitioner instructed Bullock to decide for herself whether to continue the medication and, thus, Bullock's decision to stop cannot be used against her. Nevertheless, such an instruction suggests Bullock's mental health problems

Page 12 - OPINION AND ORDER

are not particularly severe and, in any event, there were other times when Bullock failed to follow prescribed treatment as directed by other providers. Tr. 311 (1/2009; "she has not taken any of the Prozac that I prescribed for her; she instead wants to try Naturopathic medicine"); Tr. 309 (7/2009; "due for refill of Sertraline and did not realize that she had refills available at the pharmacy"); Tr. 307 (9/2009; "increase Zoloft to 100 mg if neural feedback does not help with nightmares"); Tr. 306 (1/2010; Bullock "not been taking the vitamins that she takes for depression and she never increased her dose of Zoloft to 100 mg."); Tr. 351-53 ("strong realization" that Zoloft is working for her 3/2010; describes Zoloft as "marginally effective" 5/2010, but interested in other options; then, 9/2010 reported she stopped taking Zoloft early in the summer because it was not helping her).

Finally, the ALJ noted Bullock's report to Dr. Pattinson that "all of her family was on disability benefits for mental health-related disorders. The undersigned does not find this information especially relevant, but it suggests a certain amount of secondary gain on the claimant's part, and her histrionic traits tend to support that suggestion." Tr. 29.

I find the ALJ gave clear and convincing reasons supported by substantial evidence for his determination about Bullock's credibility.

II.     Medical Evidence

Bullock challenges the ALJ's treatment of Dr. Pattinson's assessment, as well as Humphreys' "other source" opinion.

    A.     Dr. Pattinson

The ALJ included the following regarding Dr. Pattinson's diagnoses and examination: "Kara Pattinson, M.D., assessed the claimant with generalized anxiety disorder (PTSD) and

Page 13 - OPINION AND ORDER

cognitive disorder NOS. The evidence as a whole does not firmly establish PTSD or cognitive disorder as some of the claimant's impairments, and the undersigned does not consider them medically determinable for the purposes of this decision." Tr. 23. He later summarized Dr. Pattinson's medication-related meeting (which took place over two sessions) as follows: Bullock had stopped using Cymbalta, even though she liked the effects of the medication, because she was afraid of becoming dependent; all of her family was on disability benefits for mental health problems; Bullock was alert, pleasant, well-engaged, displayed linear thinking, and had grossly intact cognition despite complaints of severe memory problems; Dr. Pattinson diagnosed Bullock with generalized anxiety disorder and panic disorder with agoraphobia; the doctor recommended Cymbalta.

Bullock notes the ALJ never specified what weight he gave Dr. Pattinson's opinion, although he generally assigned significant weight to the accepted medical source opinions and indicated the "reasoning behind the weight assigned to certain opinions is included in the above analysis." Tr. 30. Additionally, according to Bullock, the ALJ left out the following notes from Dr. Pattinson's examination: a rule-out diagnosis of cognitive disorder NOS, an opinion that a psychological cognitive evaluation was indicated, and the GAF score of 50.

As an initial matter, as I quoted above, the ALJ did consider Dr. Pattinson's rule-out diagnoses of PTSD and cognitive disorder, but concluded the evidence did not support such diagnoses. Bullock does not challenge the ALJ's conclusion as to her severe impairments; in any event, the ALJ's conclusion is supported by substantial evidence in the form of Dr. Dudley's psychodiagnostic examination findings. Further, Dr. Pattinson's suggestion that a psychological

cognitive evaluation should be undertaken was made in the absence of knowledge of Dr. Dudley's examination.

The parties dispute whether the ALJ was required to assign a weight to Dr. Pattinson's examination notes. The Commissioner contends an ALJ need not specify the weight given when the doctor gives no limitations. See Turner v. Comm'r of Soc. Sec. Admin., 613 F.3d 1217, 1222-23 (9th Cir. 2010) (not clear physician found claimant disabled; nevertheless, ALJ incorporated observations into RFC); Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 601 (9th Cir. 1999) (doctor failed to explain how characteristics precluded work; further, the opinion was not supported by doctor's own notes). In any event, the Commissioner argues, Dr. Pattinson's observation that Bullock had "grossly intact cognition" despite "complain[ing] of severe memory deficits" is consistent with the ALJ's findings. Tr. 660, 663. Finally, the Commissioner concedes the ALJ should have discussed the GAF score, but argues it does not represent any limitations the ALJ could have included in the RFC.

Since the ALJ assigned "significant weight" to the treating sources, I assume the ALJ here gave "significant weight" to Dr. Pattinson's opinion (except to the extent he specifically rejected her diagnoses as severe impairments). However, the GAF is irrelevant as Dr. Pattinson did not accompany it with an opinion on Bullock's functional limitations different from the ALJ's RFC assessment; Bullock herself identifies no additional limitations reflected by the GAF score which should have been included in the RFC.[6] See 65 Fed. Reg. 50,764, 50,764-65 ("[The GAF scale] does not have a direct correlation to the severity requirements in our mental disorder

---

[6]Further, the GAF represented a fairly rare occurrence in the years of GAF scores mostly ranging from 54 to 63; Dr. Dudley himself found Bullock capable of working with a GAF score of 53-57.

Page 15 - OPINION AND ORDER

listings."). Although Bullock argues a GAF of 50 is "a disability opinion that must be addressed by the ALJ," citing Stark v. Shalala, 886 F. Supp. 733, 735 (D. Or. 1995), the case does not stand for the proposition she offers. Pl.'s Reply 2. Rather, in discussing the GAF score, the court stated, "The Secretary does not dispute that such a score indicates serious symptoms." 886 F. Supp. at 736. In addition to assigning a GAF of 50, the examining physician described the claimant's symptoms and test results and opined the claimant suffered from a Listing-level mental impairment. Further, in Purvis v. Commissioner of Social Security Administration, 57 F. Supp. 2d 1088, 1093-94 (D. Or. 1999), the court specifically rejected the notion that a GAF rating of 50 by itself required a finding of disability.

In short, the ALJ did not err as his RFC accounted for Bullock's mental impairments and nothing in Dr. Pattinson's examination notes directs otherwise.

B.  Humphreys

Bullock argues the ALJ failed to accurately weigh the opinion of Humphreys, Bullock's counselor for more than a year who detailed Bullock's memory problems in a Functional Assessment. The ALJ rejected Humphreys' opinion because Dr. Dudley provided objective findings to support his opinion that Bullock did not have memory problems, the medical evidence as a whole does not support Humphreys' opinion, she did not start treating Bullock until March 2011, and Bullock had not been compliant with her medications during this time. In addition, the ALJ questioned Humphreys' suggestion that Bullock could "appear capable" while having severe short and long-term memory problems.

Humphreys is not a licensed physician or psychologist and, as a result, is not an acceptable medical source; rather, she is an other-medical source. 20 C.F.R. § 404.1513(d). The

ALJ must give "reasons germane to each witness" in rejecting testimony of other-medical sources. Turner, 613 F.3d at 1224. Bullock asserts Humphreys should be presumed to be acting under the direction and supervision of Dr. Pattinson and, thus, an acceptable medical source, but there is no evidence Humphreys worked under a physician's close supervision. Gomez v. Chater, 74 F.3d 967, 971 (9th Cir. 1996) (a nurse practitioner could be considered medically acceptable source when she worked under a physician's close supervision).

Regardless of whether the ALJ was required to give germane reasons, or specific and legitimate reasons, the ALJ was entitled to give Dr. Dudley's opinion greater weight since Dr. Dudley is a licensed psychologist, has expertise most relevant to Bullock's impairments, and supported his findings with testing results rather than Bullock's subjective reports. Molina, 674 F.3d at 1111, citing Holohan, 246 F.3d at 1202 ("[T]he regulations give more weight to . . . the opinions of specialists concerning matters relating to their speciality over that of nonspecialists") and Smolen v. Chater, 80 F.3d 1272, 1285 (9th Cir. 1996) (holding that the ALJ should have given greater weight to a physician with the expertise that was most relevant to the patient's allegedly disabling condition).

The ALJ did not err in discounting Humphrey's opinion when it conflicted with Dr. Dudley's evaluation.

III.     Lay Testimony

Finally, Bullock points out the ALJ entirely failed to address the statements offered by her significant other and by her daughter. Bullock admits the statements simply contain more details about her alleged memory and concentration problems, but she contends the ALJ did not adequately discredit her testimony and, as a result, the error is not harmless. In addition, they

jointly reported that "sometimes" Bullock needed someone with her in public because she gets anxious, which was not something the ALJ addressed in discussing Bullock's testimony. As a result, she argues, the error is not harmless.

Lay testimony about a claimant's symptoms is competent evidence which the ALJ must take into account unless he gives reasons for the rejection that are germane to each witness. Stout v. Comm'r of Soc. Sec. Admin., 454 F.3d 1050, 1053 (9th Cir. 2006).

With respect to her memory and concentration problems, because the testimony did not describe any limitations beyond those Bullock herself described, and because the ALJ discussed her testimony at length and rejected her complaints based on well-supported, clear and convincing reasons, I am confident the ALJ's failure to give germane reasons for rejecting these lay witness statements did not change the outcome of the case. Molina, 674 F.3d at 1122. Specifically, the ALJ determined that Bullock's concentration and memory problems were not supported by the extensive, objective findings of Dr. Dudley; the ALJ also pointed to inconsistent statements, noncompliance with medications, and the possibility of secondary gain which generally undermined Bullock's testimony. Accordingly, the ALJ's error was harmless.

With respect to the lay witnesses' single statement about Bullock's need to have someone with her "sometimes" due to her anxiety around people, the ALJ included a generalized anxiety disorder as a severe impairment, and included a limitation to only occasional, superficial interaction with the general public and co-workers. Even if I fully credited the lay witnesses' statement, the RFC would not have been different. As a result, the ALJ's error is harmless. Stout, 454 F.3d at 1056 (error in failing to discuss lay testimony not harmless unless no

reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination).

The ALJ's error in discussing the statements of Bullock's significant other and daughter was harmless.

## CONCLUSION

The findings of the Commissioner are based upon substantial evidence in the record and the correct legal standards. For these reasons, the court affirms the decision of the Commissioner.

IT IS SO ORDERED.

DATED this   6th   day of May, 2015.

                                                  /s/ Garr M. King
                                                Garr M. King
                                                United States District Judge